Agenda number 12 is the last case on our call today. Number 130242, Zurich American Insurance Company, etc. v. Infrastructure Engineering, Inc. I understand that the appellee will be sharing her time. We will have the red light working for you, and I'm sure you'll be very cautious of your co-counsel's time. But at this point, if the appellant is ready, you may proceed. Good morning, Your Honors. Good morning, Counsel. May it please the Court, my name is Doug Garmager, and along with my partner, Newt Marshall, we represent the defendant, Appellant, Infrastructure Engineering, Inc., who I'll refer to for short as IAI today. Today we're asking this Court to reverse the decision of the First District Appellate Court that reversed summary judgment in favor of IAI. First District Appellate Court's decision should be reversed for two reasons. First, this is a breach of contract case, and plaintiff, Zurich American Insurance Company's only purported seller board in this case that had contractual privity with my client, IAI, was Board of Trustees of Community College District No. 508, doing business with City Colleges of Chicago, who I'll refer to as City Colleges. The undisputed evidence shows that City Colleges sustained no loss in this case, claimed no loss, and received no payment of loss from Zurich. Nevertheless, the First District Appellate Court held that because City Colleges had an insurable interest in the Malcolm X College project while it was under construction, it therefore must have had a loss as a result of a flood that occurred on August 17, 2015, that resulted in damage to equipment and property that was in the basement of Malcolm X College while it was under construction. And further, the Appellate Court held that there were delays that were sustained by City Colleges that also resulted in loss. The First District Appellate Court's decision that conflates insurable interest and loss is in contradiction with long-standing Illinois law. These are two separate and independent constructs, and they have to be evaluated separately. Also, there is no evidence in this case of delays. There's no evidence that City Colleges suffered from any delays as a result of this August 17 flood, that Zurich paid any delays as a result of the August 17 flood, or that, and in fact, actually, Zurich's policy excluded delays so that there was just absolutely no coverage for delays in the first place. You're saying that City Colleges did not suffer loss? Not in connection with this August 17 flood. The second issue that we believe this Court should reverse the First District Appellate Court on is that Zurich is seeking an unprecedented outcome in this case, which is that it's seeking the ability to subrogate on behalf of one insured City Colleges based on the loss that was sustained by, claimed by, and paid to its other insured CMO, the general contractor. This isn't allowed under the terms of Zurich's own insurance policy, the subrogation provision in that policy. Counsel, you say City Colleges did not suffer loss. They owned the building, did they not? They did not. They owned the property, and they Where the building was being constructed. Right, and the building was being constructed. And as a result of the flood, was there any delay in any campus activities or anything that was occasioned by the flood? No, there's no evidence of delays. This is a building that was completely under construction at the time of the August 17 flood. The phased occupancy of the building was several months away at the time. Consider, this is kind of like the situation you see, like a house being built in a residential neighborhood, and there's a muddy lawn, no trees, and tieback ramp on the walls on the outside, pipes not connected. That's essentially what we're dealing with here. There's no students in the building. So the owner of the property, because he did not collect the insurance check, is, in your opinion, suffered no loss? I don't think it's just because he didn't receive any money from the insurance check. I think that's one portion of it, but also the fact that this was a Well, I didn't say they didn't receive any money. I don't know whether they did or they didn't, but I know that the money was paid to CMO because they were the general contractor. Right. They were the party that was building the Malcolm X College at the time. They were the party that was responsible for means and methods of construction, sequencing. They were responsible. I understand that, but isn't it customary for the general contractor to be the one that purchases the insurance? And then they have many other additional insureds, so those people are covered by the policy? I think that is a common practice for the general contractor to purchase the builder's risk policy to cover losses that occur to other people on the project. So, for instance, in this case, there were many insureds. It could have been the owner itself. It could have been, excuse me, City Colleges itself. It could have been the subcontractors, sub-subcontractors. It covers all those parties' different interests. So what makes you say with certainty that City Colleges, although the property was theirs, they didn't suffer a loss? Sure. I think it goes to the contract and who was responsible for what on this project. So going back to the contract itself between City Colleges and CMO, the contract gave extensive control over this project, over the construction of this building to CMO. So during construction, again, CMO was the one that was responsible for sequencing how the building was built. They were responsible for the means and methods. They were responsible for protecting the work that they did and the materials. Your argument suggests that because CMO was the general contractor and is the one that purchased the insurance coverage, that none of the other insureds had really any, couldn't benefit from that insurance, or they weren't in any way insured in a direct way or indirect way. As an additional insured, you are insured by that policy, right? Correct. You're an insured. And I'm not saying that there weren't other people who were entitled to coverage under that policy to the extent that they were. What you're saying, City Colleges wasn't one of those people, is that right? They were entitled as an insured generally to coverage under the policy, but they had no loss here. And you can't get an insured. And what do you, what's a loss? What constitutes a loss in your opinion? Sure. And I think a loss is some type of pecuniary harm, some type of detriment to your interests on this project. And at the time of this flood loss, the interests were with CMO. CMO, again, was the one, they had the responsibility to build this building. They were still several months away from even delivering this building to City Colleges. So I think we used in our brief, we used the hypothetical example. If you buy a car and while it's being built at the assembly plant, right, there's things that happen, things that go wrong during the manufacturing process. You as a purchaser of this vehicle, you probably don't know all of these things that are happening unless you get something that you didn't buy. Using that same example, if as a result of the whatever went wrong, you're delayed from the time that you expected delivery and assuming the City College was delayed from the time they thought this was going to be completed, is that some kind of injury that would be insurable? I think that could be an injury that's insurable, but that's not what happened here. There were no delays occasioned by this flood event that were sustained by City Colleges. There's no evidence that anything was delayed because of this August 17th flood. Council, is there a dispute as to whether or not there was a loss by City College? I believe there is. My understanding, my opponent's argument is similar. It's essentially that because they were the owner of the property, they must have sustained a loss here. And because they had an insurable interest in this project. And is there any specific loss that's identified by City Colleges? I'm not aware of what that specific loss would be. I think the loss that they're claiming is whatever the August 17th flood meant the damage to the mechanical equipment. They're saying that that was a loss of City Colleges. We're saying that was a loss of CMO, the general contractor. So really the question here is whose loss was it? I think that everybody agrees there was a loss. It's just who owned that loss? And we're saying CMO owned that loss. Because again, they were the ones that were building this building. They had to deliver it to City Colleges in the future, at a point in the future. And in order to do that, in order to fulfill their contractual obligation to City Colleges, they had to submit their claim to Zurich. They had to get that property fixed. The property that they were contractually required to protect during the construction process. And they needed to finish construction so they could meet their deadlines to deliver this project to City Colleges. Council, was CMO the agent of City Colleges? I don't believe they were the agent. I think the argument that's being made here by my opponent is that under the policy, there's a specific provision that designates the name insured under the policy. So that would be CMO to act as the agent for all other insureds on this policy. So they weren't agents in fact? That's what you're saying? I'm saying they weren't acting as an agent in this particular scenario. Because there was no loss here. City Colleges never, there's no evidence they authorized a claim to be made on their behalf under this policy. There's no evidence they even had a loss to make a claim on. And there's no evidence that they received any payment from Zurich at any point. So while if they did have a loss, they would have had to go through CMO and have CMO bring that claim to Zurich to get paid. That's not what happened here. CMO did all of this on their own. CMO submitted this claim on their own. But they were not acting on behalf of the City Colleges? No, not in submitting this claim. There's no evidence in the record that's been pointed out any time that they were acting as the agent of City Colleges in making this claim. Counsel, who paid the premium on this insurance coverage? My recollection is that CMO was reimbursed the premium by City Colleges as part of the contract, right? So, and again, there's no dispute here that City Colleges was an insurer of this policy and could potentially be entitled to benefits to the extent it had a loss. We've never made the argument otherwise. We're just saying they had a loss here that supported a claim under the Builder's Risk Policy in the first place. And I think that's evidenced by the fact that we look who paid the deductible for this particular claim, right? It was CMO. CMO paid this deductible out of its own pocket. They submitted the claim on its own. They took the payment. They fixed the damage to the mechanical equipment in the basement. And they ultimately delivered to City Colleges the project that City Colleges had bargained for. They got their building. And in this regard, we've appointed the court in our briefing to have even the Springfield Fire and Reinsurance case, which the First District called a court case. And I think that that case is quite analogous to the current situation. So in that particular case, we have plaintiffs that have an option to repurchase property, a residential property. And the court found that the plaintiffs had an insurable interest by virtue of having that option to repurchase the property. So while the plaintiffs own this option, there's a fire at the property. Fire damaged the owner, which is a trust company. They submit a claim to their own insurance carrier. The insurance carrier comes in, fixes all the fire damage at the property. And after that, the plaintiffs exercise their option to purchase this house. And they sell the house to a third-party purchaser. But they also submit a claim to their own insurance carrier. And they say, hey, there was a fire damage at the property. We'd like to get paid for that. And the fire insurance company says, sorry, there's no loss here. And the appellate court agreed. And the thing that they noted that I think is particularly relevant is that they say the plaintiffs sold the property. When they ultimately sold that property to the third-party purchaser, they did it for as much as they would have received from their buyer had the fire never occurred. And I think the situation here is the same. There's no dispute that City Colleges had an insurable interest in the Malcolm X College project to the extent of its rights and obligations under the contract. But it was Zurich's other insured CMO that was responsible for sequencing construction. They were responsible for putting this equipment in, protecting it during the construction process and delivering this building. And so in order to do that, to meet their contractual obligations, they submitted a claim to Zurich. They got the mechanical equipment fixed. And at the end of the day, just like the owners in Beeman, but just like the plaintiffs in Beeman, they delivered the project to City Colleges as if no flood had ever occurred. So City Colleges received the exact benefit of the bargain. They got the building they wanted as if a flood had never occurred. So just like those plaintiffs that received, you know, when they exercised their option, they had a house as if a fire had never occurred, here City Colleges also had a building as if no flood had occurred. So I think just like those plaintiffs in Beeman, there's no loss. At Council in Beeman, the parties stipulated the repair was completed without cost or expense to the plaintiffs, did they not? Correct. So is that distinguishable from this case? I don't believe so. Well, I mean, as far as the plaintiffs not having any costs in that case, I don't think City Colleges, they've never claimed that they had any costs in this case. Instead, they received exactly what they bargained for. Again, CMO is the one that paid the deductibles, so that was CMO's cost to submit the claim to the insurance. And City Colleges never had any delay damages as a result of the flood damage. So I don't know what costs. I'm not aware of any evidence that they had sustained any extra costs as a result of this August 15th flood event. And, you know, another thing I think we talked about, the appellate court found that there were delays in this case, and frankly the genesis of that is in my opponent's appellate reply brief, there was an assertion made for the first time that City Colleges had sustained some type of delays during the construction process. There was no citation to the record. The appellate court cited that as an element of loss that was sustained by City Colleges. But again, there's really no evidence at all in this case that City Colleges sustained the loss or got paid the loss by Zurich. And as we noted in our brief, the delay damages were specifically excluded under the Zurich policy. And I think another big issue in this case is what we kind of think of as the elephant in the room, is that this case continues to be brought by Zurich as the subrogate of two different subrogates, CMO and City Colleges. Now, Zurich admitted in the circuit court that there is no contractual privity between CMO and City Colleges that would allow them to reach a contract claim, which is all that exists at this moment under a subrogation theory. CMO has no privity. And because of the appellate court's reversal of the summary judgment in the circuit court, that claim still stands at this point. There's a breach of contract claim where Zurich is asserting a subrogation theory on behalf of CMO, a party that has no contractual privity. So the question is, why are they doing that? And it's because Zurich has a big problem in this case, which is that they paid a claim for one insurer, CMO, and that was the only party that ever submitted a claim, received payment for a claim, but they have no contractual privity with IA. So what they're doing is they're taking the damages of one party, and they're taking a contract for a completely different party, City Colleges, their other sub board, and they're trying to mush them together and bring some kind of hybrid positive action where they're asserting contract duties for one party, damages sustained by another party. And so that kind of leads to the second issue that we find that we believe this court should reverse the appellate court on, which is, again, Zurich is trying to subrogate here on behalf of one insurer, City Colleges, based on a law sustained by a completely different insurer. So in our briefing, we cited these three elements of subrogation that the circuit court relied upon. We believe that those elements should be applied in both the equitable and contractual subrogation context. The elements are a third party was primarily liable for the loss, insurer was secondarily liable for the loss, and then the third element is the insurer paid the insurer the policy extinguishing the debt of the third party. In our view, this is just basically a restatement of the concept of subrogation itself under Illinois law. This court defined subrogation in Sheckler v. Auto Owners as the principle under which an insurer that has paid a loss under insurance policy is entitled to all rights belonging to the insurer against the third party. That's basically what these three elements accomplish. And the third element is that an insurer cannot exercise his right of subrogation until it has paid the loss of the insurance damages under the policy giving rise to the subrogation rights. So again, the third element is the insurer has to have paid the insurer before it can take some kind of right of subrogation on its behalf. But even if this court finds that those elements only apply to an equitable subrogation claim and not a contractual subrogation claim, the terms of Zurich's own subrogation provision do not allow for subrogation here. It says if a company pays a claim under this policy, they are subrogated to the insured's rights under the policy. So they use the definite article the and the singular insured. So who is that insured, the insured? It has to be the insured who has received a claim payment from Zurich because otherwise they would have written it as if the company pays a claim, it will be subrogated to every insured's rights of recovery or all of the insured's rights of recovery. But they're talking about a specific insured. And we know this because if you look at the excess recovery provision later on, they say, well, okay, if there's an excess recovery, all those payments get remitted to the insured. In other words, the insured is referenced throughout that section. Zurich's saying that insured could be anybody regardless of whether they had a claim paid. But if you're remitting excess recoveries to that insured, why would – it doesn't really make sense that an insured who had no loss and didn't get paid for a loss but then get excess recoveries. So there's this internal inconsistency that Zurich has addressed. And I see my time is almost up. So unless there's any other questions, I'll save them for later in my argument for rebuttal. Thank you. Thank you very much. Counsel for the athlete for the first argument. Good morning. Good morning. My name is Patrick Hess. I'm grateful to be here today with my partner, Jenna Mahoney. And to Chief Justice's point earlier about trying my best to be respectful over time, I've been better to throw a shoe at my head if I go over by any counsel to the shoe again. Justice Overstreet, you asked, did city colleges suffer a loss? And that begs the question of what loss means in the context of this litigation. It's property insurance. It's builder's risk insurance that covers the risk of property damage during the course of a building's construction. Loss in this context simply means physical damage to property. In this case, it means physical damage to a Malcolm X College building during the course of its construction. Justice Cunningham, you asked if city colleges suffered a loss. They did, in the sense that they had an interest in that building. They were the proud owners of a nearly complete building the day before the flood happened. And then when the flood happened, they were the somewhat sad owners of a building in need of extensive repairs so that construction could proceed. So was there a delay in the delivery of the completed building? There was not. Did city college ever make a claim for any loss? In regards to a delay? City colleges did not deal with the insurance company as it relates to the insurance claim. City colleges did not directly pay the premiums. City colleges did not receive claim payments from the insurance company. All those things are true. And they reflect the fact that this policy has multiple insurers. Builders' risk insurers know that multiple folks have an interest in a building under construction. Builders' risk policies are thus written to accommodate and name multiple insurers. This policy says that the named insurer is the person who buys the policy. Here it was CMO that bought the policy. They then became the named insurer. This policy defines additional named insurer to include all owners, all contractors, all subcontractors of every tier to the extent required by contract. The construction contract that issued here between city colleges and CMO addressed the issue. On construction projects as large and sophisticated as this one, the owner and contractor know about builders' risk insurers. They know it covers everybody who has an insurable interest in the project. They know they need to decide who between the two of them will purchase the policy. In this case, they agreed that the general contractor would purchase the policy. Justice Cunningham, you asked if that's uniformly true. No, it is not. It varies from project to project to project who the owner and contractor decide will be between the two of them, the one to purchase the policy. For purposes of the coverage, it does not matter who purchases the policy because at the end of the day, the policy is written to cover them both. It covers both of their interests in the building during the course of its construction. It was asked if CMO is the agent of city colleges by Justice DelVille, I believe. This gets back to your question, Justice White, about who paid the premiums, who handled the insurance claim, who received the claim payments. The policy assigns certain duties to the named insurer. It doesn't ask them, I'm sorry, it designates them as the sole and irrevocable agent of all the insurers for some certain purposes. What are those purposes, the ones we talked about? Who's paying the premiums? Who's the point of contact with the insurance company during any insurance claims? Who's going to receive the claim payments? That serves practical purposes, right? It gives the insurance company a single point of contact among these many insurers. It avoids confusion or disputes among those many insurers about who's going to pay the premiums in the event of a claim. Who's got the unthankful task of working on that insurance claim? And it designates a certain person among them to receive those payments. They know best where that money should go. The building's going to get repaired because it's being repaired due to the flood. They know where that money's got to get to to make sure that those repairs happen. And that benefits all the insurers, right? That benefits the owner, it benefits the contractor. It may have been the contractor that performed that work, but believe me, they wanted to get paid for that work. And where did that money come from? The insurance company. While there is a distinction in the policy in terms of who's that sole and irrevocable agent for insurance purposes, the segregation clause in that same policy draws no distinction between named and additional named insurers. Period. The first district here clearly, forcefully, and correctly ruled that based on the segregation term in this policy, our client, Zurich, is segregated to both the owner and general contractors, rights of recovery against all third parties. Period. It goes on to say all third parties includes the owners and contractors of all insurance rights against architects and engineers. The defendant in this case is an engineer. This is a straightforward question of contract. Whether Zurich has a segregation right against the defendant in this case turns on the policy language plain and simple. That's what the appellate court ruled. That serves justice. We ask that the appellate court's decision that this contractual right of segregation by Zurich against the defendant be affirmed. If there's any further questions for me, my partner will address the inapplicability of equitable segregation as applied here. Thank you.  Ms. Mahoney. May it please the court, counsel, my name is Jenna Mahoney, and I represent the plaintiff, Zurich, along with Mr. Hess. And as you heard from Mr. Hess, Zurich's segregation rights in this case depends solely on the applicable contract, not the separate and distinct elements of equitable segregation. As this court has recognized, there are two distinct rights of segregation in Illinois, contractual and equitable. Contractual segregation rights are those that are expressly provided for in an insurance policy or written instrument, whereas equitable segregation rights are based on equitable principles where there's no governing contract. Stated differently, where there's a specific contract that governs the relationship between the parties, equitable rights and remedies have no application. As such, the first district perhaps unremarkably held that the existence of the unambiguous segregation clause in this case barred the application of equitable principles. Perhaps more importantly, the first district went on to not only distinguish the cases that are relied upon by IAI, such as Swedish American Economy Premier and Trott v. Robinson, but also explicitly disagree with their holdings in as far as those cases held that the elements of equitable segregation control over the express terms of an insurance policy. Simply put, contractual terms cannot be overridden by an equitable analysis. Most of the segregation cases IAI relies upon in this case involve claims of equitable segregation with the same basic fact pattern. For example, Swedish American and Economy Premier both involve disputes between liability carriers. One liability carrier would pay to settle an underlying claim and then seek to recover its payments from the second liability carrier. Notably, the court in both of those cases did not discuss the distinction between equitable and contractual segregation rights and their distinct elements. Rather, the courts in those cases simply applied the elements of a claim for equitable segregation that was recited by this court in Home Insurance Company. Unlike Swedish American and Economy Premier, Trott v. Robinson involved only a claim of contractual segregation and a different fact pattern. In Trott, the plaintiffs sustained personal injuries in a car accident and the resulting medical bills were paid for by the automobile insurance policy, which happened to have a segregation clause. The plaintiffs then went on to file suit against the at-fault driver and settled their case. The plaintiff's insurer subsequently asserted a claim over those settlement proceeds based on the insurance policy, namely the segregation clause, and the circuit court ruled in favor of the insurer. On appeal, the plaintiffs raised several arguments as to why the segregation clause should not be enforced. However, before addressing those arguments individually, the appellate court stated generally, in the case of an insurance contract, segregation rights arise where, one, a third party has caused a loss and is primarily liable to the insured for the loss. Two, the insurer is secondarily liable for the loss based on the insurance policy. And three, the insurer pays the insured under that policy, thereby extinguishing the debt owed by the third party. That being said, the appellate court then went on to analyze the insurer's rights, namely the enforceability of that segregation clause, under contract law. For example, the plaintiffs in that case argued that the segregation clause required their insurer to sue the at-fault driver before they could require any segregation rights. The appellate court rejected the plaintiffs' argument. They found that the policy was not ambiguous and enforced the segregation clauses drafted. Thus, despite citing to the elements for a claim of equitable segregation, the court ultimately determined the insurer's rights based on the expressed terms of the policy. As such, the cases here that have been relied upon by IEI offer zero support for the argument that determining Zurich's segregation rights should be based on anything other than the policy. IEI harps on this notion that city colleges did not sustain a loss because it did not submit a claim to Zurich or receive claim payments. Zurich maintains whether city colleges sustained a loss in this case is irrelevant because it relates to an element of equitable segregation. Per the segregation clause in this policy, the relevant inquiry here is did Zurich pay a claim under the policy, not whether city colleges sustained a loss. Outside of the segregation cases that we've discussed, the remaining cases cited by IEI offer little support for this loss argument. As counsel discussed, Beeman involves a coverage dispute. The plaintiffs in Beeman conveyed their property to a trust company with the option to repurchase to avoid a foreclosure. A fire then damages the property, and they file a claim with their insurance policy. However, the trust company, as owner of the property, makes the necessary repairs in Beeman and then files a claim with its own insurance company and is reimbursed. Once the repairs are completed, Beeman exercises their option to repurchase the property and then sells it. The plaintiff's carrier denies liability to Beeman, arguing that they suffered no loss that was recoverable under their policy. In short, the plaintiffs in Beeman were not the owners of the property at the time of the fire. They only obtained their ownership interest after the fire and the repairs were completed. Therefore, their insurance policy did not recognize a loss that was covered under the policy. Unlike the Beeman plaintiffs, City Colleges owned the property at the time of the flood. And, as Mr. Huss explained, the building sustained a direct physical loss that was covered under Zurich's policy. The fact that City Colleges did not personally submit a claim to Zurich, or the fact that Zurich did not cut any checks to City Colleges, does not mean that City Colleges did not sustain a loss. IEI ignores the logical explanation that City Colleges did not directly communicate with Zurich, receive claim payments, or even make premium payments because the policy directed otherwise. Therefore, the First District in this case followed the well-settled rules of contract law in holding that City Colleges was insured under Zurich's policy, that City Colleges had a tangible, insurable interest in the insured policy at all times, that City Colleges suffered a loss due to the August 2015 flooding, that Zurich acquired City Colleges' rights to recover against third parties, including IEI, and that equitable principles played no role in the court's determination of Zurich's segregation rights. I see that I'm almost out of time, so if there are no further questions, we respectfully request that the First District opinion be affirmed, thereby confirming that the existence of an unambiguous segregation contract provision bars the application of common law or equitable principles. Thank you for your time. Thank you very much. And Council, in rebuttal. Thank you, Your Honor. I'd just like to hit a few points here. So, first, we just heard Council admit there were no delays on this project, so I think that's just an element of loss that's completely off the table. There's no evidence of it. Second, with regard to the issue of whether City Colleges had a loss, Mr. Hess referred to the fact that City Colleges obtained some type of benefit because the claim was paid to CMO to fix this mechanical equipment. However, the fact of the matter is, this is not a situation when they're referring to the Beeman case, right? They say, well, in that case, just like here, City Colleges was the owner, and they're the owner of here. They're mixing up their analogy here because the owner in the Beeman case was an owner that actually had a possession of that house. They were occupying, they could have occupied that house. It was their house to possess. Here, City Colleges is more like that party that has an option to repurchase this property. They don't have, at this point in time, in this August flood curse, City Colleges can't just walk into the property and start using it. This is a building that's being built. The party that has custody of this building, that has custody of all the work and the equipment, is CMO, the general contractor. That's the party that's working on this building to build it. And so to the extent that City Colleges, or excuse me, to the extent that there's a claim for loss that's submitted to Zurich, that's the claim of CMO, because CMO is the one that has possession of that building. They're the ones that need to repair that building to deliver that building to City Colleges in the future. And this kind of goes back to the, I'm going to use a different hypothetical. We talked about the car earlier. Let's talk about a house under construction. If I'm a property or a purchaser of a new house that's being developed or built, okay, this house, again, maybe there's pipes that are not connected. Maybe there's skylights that aren't installed. And during the construction process, I'm the owner of the house. I'm not occupying this house. I'm not living in this house. Water comes pouring in, damages some elements of the construction. Well, the builder of the house, they go and submit a claim to their builder's miscarrier, because they've got to fix that problem. Because they need to deliver that house to the purchaser when the contractual delivery date is. That's the same situation we have here. And that purchaser, the purchaser who's waiting for this house, as long as all of those elements, those damaged elements, are fixed and repaired, they don't even know about a loss. And that's what happened here. City Colleges, we have the testimony of David Sanders. He never communicated with Zurich about anything. I think my opposing counsel admitted. David Sanders, City Colleges never communicated with Zurich about this claim. They never discussed the amount of the loss payment. David Sanders doesn't even know how much money Zurich paid out on this claim. They had no involvement whatsoever, because it didn't matter to them at that point in time. They are waiting for a project that's not yet due to them. And, counsel, is your position in line with the contractual language in this specific instance? Yeah, I believe it is. Because, again, we have the, at the beginning of the contract, I'm sorry if I can grab my notes real quick. Section 4.3 of the contract, this is record page 9596. It provides for a substantial completion date of December 31, 2015. That same provision provides for the phased occupancy of the building beginning in November 2015. So, again, we have a flood that happens in August 2015. I'm talking about the fact that, you know, what does the contract say about the ability, you know, for subrogation in this instance in the position of the parties? Because, you know, you're basically arguing that City Colleges didn't suffer any damage, that there's basically nothing for Zurich to subrogate regarding, because there was no loss. Yeah, I don't believe the contract speaks in terms of what happens during subrogation. I mean, it obviously requires the purchase of a builder's risk policy. But the contract here really doesn't touch on subrogation, because it governs more whose rights and responsibilities, who has different risks and responsibilities with respect to the project while it's under construction. And so, I mean, we can go back to the fact that this is CMO. They're the ones that make the decision of when equipment goes in. They're the ones that are responsible for protecting the equipment. That's section 10.2.1, record page 9640. They have responsibility for taking precautions to prevent damage to the work. And that includes the materials and equipment that comprise that work during the construction process. They're the ones responsible for that. And until this building has a delivery date, or until that delivery date arrives, the contractual delivery date, this is not City College's building to occupy. They don't know. This building is being built separate and apart from City College's. They're just waiting for the delivery of this building. And if they get that building, and it's in a condition as if no flood had ever occurred, there's no loss to them. There's just nothing that they would even have to worry about, ever. And so, again, I just think that the record here shows that this was all CMO's loss all along, and that's consistent with CMO's conduct of submitting a claim on its own, of paying the deductible out of its own pocket, receiving the claim payment. And with respect to the agency question, you know, my opponent would say, well, under the policy, they're the agent of all the insurance in the policy. When do we see an agent acting completely unbeknownst to its principal with respect to a million-dollar claim? I mean, we haven't seen any evidence cited where City Colleges had any knowledge of what was going on with the insurance process. Again, they don't even know what got paid on this. So it's kind of, you know, incredible that they would be acting as the agent of City Colleges and City Colleges doesn't even know about the claim or the payment. And then, lastly, as far as just general subrogation principles, you know, one of the concerns in this particular case is that there's a variety of different subrogation principles that have developed, excuse me, throughout the law. And a couple of them are, like, for instance, there's when you subrogate, you do not gain any, you stand on the shoes of your subrogator. Your subrogator does not gain any additional rights by virtue of the fact that you're subrogating. But here, what Zurich is trying to do is they're trying to assign one party's damages to a new subrogore. And that is absolutely an increase in the subrogation rights solely by reason of subrogation because that subrogore would never have those damages in the first place. But Zurich is saying, well, under our policy, we can do that because we can subrogate on behalf of anybody, any insurer. There could be hundreds of insurers. As long as we pay the claim, we can subrogate on behalf of them, and we can give those damages to them in a sort of breach of contract claim. Well, I don't think that that's the case, and I think that really undermines the entire concept of subrogation, which is, you know, in some, you know, at its very core, you just stand on the shoes of the subrogore. You have their rights. You don't get any greater right by virtue of subrogation. So we would ask this Court to reverse the decision of the First District Appellate Court and grant, excuse me, affirm the judgment of the Circuit Court of the County of Gregg, summary judgment tie-out. Thank you. Thank you so much. This case, Agenda Number 12, Number 130242, Zurich Insurance, American Insurance Company, et cetera, versus Infrastructure Engineering, Inc., will be taken under advisement. Thank you both for your arguments. All of you.